UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
FRANCIS BROOKE, et al.,

                             Plaintiffs,

v.

COUNTY OF ROCKLAND, et al.,

                             Defendants.
---------------------------------------------------------X

**MEMORANDUM OPINION
AND ORDER**

17-CV-03166 (PMH)

PHILIP M. HALPERN, United States District Judge:

Plaintiffs Francis Brooke ("Brooke") and his company, FMB Enterprises LLC ("FMB" and together, "Plaintiffs"), commenced this action against Defendants the County of Rockland (the "County"); Steven Heubeck, Director of Rockland County Police Academy in his official and individual capacities ("Heubeck"); the County of Rockland Sheriff's Department (the "Sheriff's Department"); the Police Chiefs' Association of Rockland County (the "PCA"); Sheriff Louis Falco, County of Rockland Sheriff's Department in his official and individual capacities ("Falco"); Undersheriff Robert Van Cura, County of Rockland Sheriff's Department in his official and individual capacities ("Van Cura"); Spring Valley Police Chief Paul Modica in his official and individual capacities ("Modica"); Piermont Police Chief Michael O'Shea in his official and individual capacities ("O'Shea"); and Orangetown Police Chief Kevin Nulty in his official and individual capacities ("Nulty"). (Doc. 2). On August 31, 2017, Plaintiffs filed an Amended Complaint against the same Defendants alleging claims under 42 U.S.C. § 1983 involving First Amendment retaliation, tortious interference with contractual relations and/or prima facie tort, and defamation. (Doc. 79, "Am. Compl.").

On October 13, 2017, motions to dismiss the Amended Complaint were filed by Heubeck, the Sheriff's Department, Falco, Van Cura, Modica, O'Shea, the PCA, and Nulty. (Docs. 92, 96,

100, 102, 107). The County filed an answer. (Doc. 95). After the motions were fully briefed, on July 20, 2018, Judge Seibel issued a bench ruling granting in part and denying in part the motions to dismiss. (Doc. 211, "Chafizadeh Decl." Ex. JJ, "Tr."). Judge Seibel dismissed the First Amendment retaliation claim against the Sheriff's Department, Falco, Modica, O'Shea, and Nulty, the defamation claim against the Sheriff's Department, Van Cura, Falco, Modica, O'Shea, Nulty, and the PCA, and the tortious interference and prima facie tort claims against Huebeck, PCA, Modica, Falco, and Van Cura; thus, Plaintiffs' surviving claims were First Amendment retaliation against the County, the PCA, Heubeck, and Van Cura, and the claim for defamation against Heubeck. (Tr. at 54:21-55:16). Following discovery, Judge Seibel granted the requests for leave to file motions for summary judgment which were made by the Defendants who remained in the action: the PCA, the County, Heubeck, and Van Cura ("Defendants"). This action was reassigned to me on March 17, 2020.

Pending presently before the Court are three motions for summary judgment seeking dismissal of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56: (1) a motion filed by Heubeck and Van Cura (Doc. 198; Doc. 199, "Heubeck Br."); (2) a motion filed by the PCA(Doc. 207; Doc. 208, "PCA Br."); and (3) a motion filed by the County(Doc. 209; Doc. 215, "County Br."). Plaintiffs opposed Defendants' motions (Doc. 206, "Pl. Br."), and the motions were fully submitted with the filing of Defendants' reply papers (Docs. 197-2 ("PCA Reply"), 203-205, 217).[1]

For the reasons set forth below, Defendants' motions are GRANTED.

---

[1] Citations to documents filed by the parties herein, including the parties' briefs, correspond to the pagination generated by ECF.

## BACKGROUND

The relevant facts, as recited below, are taken from the Amended Complaint, Defendants'
Joint Local Rule 56.1 Statement ("Rule 56.1 Statement") (Doc. 210, "56.1 Stmt."), Plaintiffs'
opposition to Defendants' Joint Local Rule 56.1 Statement and Counterstatement of Undisputed
Facts ("Opposition to Rule 56.1 Statement") (Doc. 206-51, "56.1 Opp'n"),[2] and the admissible
evidence submitted by the parties.

Brooke was a Spring Valley Police patrol officer from February 15, 1988 through February
15, 2016 and taught various courses at the County's Police Academy (the "Academy") during his
tenure. (56.1 Stmt. ¶ 10). On or about July 30, 2015, the County issued a "Request for Proposal"
for Management, Training, and Consulting Services for the Academy for the 2016 calendar year
(the "2016 RFP"). (*Id*. ¶ 17). The 2016 RFP sought to fill certain positions, including the positions
of Basic School Coordinator ("BSC") and Academy Director. (*Id*. ¶ 18). Brooke's company, FMB,
submitted a proposal in response to the 2016 RFP for the BSC position. (*Id*. ¶ 26). The BSC
contract was awarded to FMB for a term of January 1, 2016 through December 31, 2016 (the
"FMB Contract"). (*Id*. ¶ 30; Chafizadeh Decl. Ex. P). The FMB Contract was signed by County
Executive Edwin Day (the "County Executive") on behalf of the County. (*Id*. ¶ 31; Chafizadeh
Decl. Ex. P at 8).

---

[2] The Local Rules of the United States District Courts for the Southern and Eastern Districts of New York
instruct that a "paragraph in the [movant's] statement of material facts . . . will be deemed to be admitted
for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in
the statement required to be served by the opposing party." Local Civil Rule 56.1(c). Furthermore, "[e]ach
statement by the . . . opponent . . . *including each statement controverting any statement of material fact,
must be followed by citation to evidence which would be admissible* . . . ." *Id*. at 56.1(d) (emphasis added).
To the extent that Plaintiffs fail to cite to any evidence in connection with their opposition, in accordance
with the Local Rules, the Court deems Defendants' statements of fact admitted unless controverted by
Plaintiffs *and* supported by evidence.

The FMB Contract set forth Plaintiffs' duties including, *inter alia*, the duty to ensure that "[t]he school must meet the mandates of [New York State Division of Criminal Justice Services ("DCJS")] and established [A]cademy procedures." (*Id*. ¶ 32 (citing Exhibit P at 10)). Brooke also stated that Plaintiffs believed that the BSC was to implement a professionally-run Academy. (*Id*. ¶ 99). FMB's duties included regular contact with DCJS, and those interactions included submitting curricula for approval, and corresponding on issues such as approval of course instructors and scheduling changes. (*Id*. ¶ 36).

The DCJS oversees Academy training (*id*. ¶ 8), and is tasked with supervising all basic schools in the state (*id*. ¶ 9; Tr. at 43:5-9). Brooke had a twenty-five-year relationship with the Academy, and thus with DCJS as well, and Plaintiffs were required to regularly communicate with DCJS as BSC. (*Id*. ¶¶ 10-16, 36-40). In addition to reporting to DCJS, Plaintiffs believed they were required to report only to the County Executive, although the FMB Contract did not so explicitly provide. (*Id*. ¶ 35; Chafizadeh Decl. Ex. P). Rather, the FMB Contract provides that Plaintiffs' services were to be performed "under the supervision of the Academy Director." (*Id*. ¶ 32 (citing Chafizadeh Decl. Ex. P at 10)).

The Academy Director, in turn, was to "be responsible for the overall operation of the academy. . . [and to] guide and manage all personnel assigned to the academy as either independent contractors or employees of the County, Towns or Villages." (*Id*. ¶ 25 (citing Chafizadeh Decl. Ex. O at 13)). Heubeck was awarded the contract for Academy Director for the same 2016 term as the FMB Contract. (*Id*. at ¶ 33).

The relationship between Brooke and Heubeck was fraught from the beginning, and within two weeks of the commencement of FMB Contract, the parties "had many conflicts with each other." (*See id*. ¶¶ 41-109). In January 2016, Heubeck and Brooke had disagreements concerning

4

teaching style, philosophies, and methodology; and Brooke felt that Heubeck "spoke to him like a child" and "was a bully." (*Id*. ¶¶ 44-52). Concerned about the FMB Contract, Brooke sought out clarification from Modica, then-President of the PCA, as to the relationship between Heubeck, as Academy Director, and Brooke, as BSC. (*Id*. ¶¶ 64-66). Brooke expressed concern to both Modica and Van Cura about Huebeck exercising authority over Brooke, with which Brooke disagreed. (*Id*. ¶¶ 66-69).

On March 14, 2016, while acting as BSC, Brooke observed a student teaching a portion of a Defensive Tactics Instructor ("DTI") training course that was being run by Heubeck. (*Id*. ¶ 74). Brooke advised Modica of same, and also informed him that Brooke was listed on a curriculum submitted by Heubeck to DCJS as being the certified instructor for eight classes of the DTI course when he, in fact, did not teach that course. (*Id*. ¶¶ 74, 78).

In May 2016, Brooke and Heubeck had a series of disagreements and their relationship continued to deteriorate. (*Id*. ¶¶ 79-88). At a June 9, 2016 meeting of the Academy's Board of Directors, known as the Training Council, the Training Council unanimously voted to request that the County terminate the FMB Contract. (*Id*. ¶ 110). On July 5, 2016, Van Cura called Brooke and advised him that the FMB Contract was being terminated, and a letter from the Principal Assistant County Attorney, Antonio Reda, notified Brooke that the County was terminating the FMB Contract effective August 5, 2016. (*Id*. ¶¶ 127, 129). On July 12, 2016, the County Executive advised Brooke that the County Attorney's Office did not have the authority to terminate the FMB Contract, and that because only the County Executive had authority to terminate the FMB contract, the County Executive would rescind the termination. (*Id*. ¶¶ 136, 139). A letter rescinding the termination was sent the same day. (*Id*. ¶ 140). Nonetheless, on July 13, 2016, the process to

terminate the FMB Contract continued with the Sheriff's Department sending a letter to the County Executive seeking to implement the Training Council's June 9, 2016 decision. (*Id.* ¶¶ 141-142).

During his July 12, 2016 conversation with the County Executive, Brooke had expressed concerns he wanted to discuss to protect the Academy and the County from potential liability; the County Executive directed Brooke to contact the County Attorney. (*Id.* ¶¶ 137-138). On July 15, 2016, at the direction of the County Executive, Brooke met with County Attorney Thomas Humback and Assistant County Attorney Larraine Feiden (together, the "County Attorney") and expressed his concerns about Heubeck. (*Id.* ¶¶ 148-150). Brooke complained to the County Attorney that Heubeck: (i) used uncertified instructors to conduct trainings in the DTI Course for the Academy; (ii) assigned Brooke's name to the DTI class curriculum although Brooke was not directed to teach the classes and did not teach the classes; (iii) used a curriculum that did not meet State-mandated requirements; and (iv) falsified documents submitted under penalty of perjury. (Am. Compl. ¶¶ 32-38, 42-46; 56.1 Stmt. ¶¶ 74-78, 148, 150, 229-230). In July 2016, Plaintiffs contacted DCJS to gather information for his investigation into Heubeck. (56.1 Stmt. ¶¶ 147, 156, 161-165).

Brooke advised the County Attorney that he believed classes were not being conducted in a State-approved manner, and specifically, he outlined his concerns about the DTI course, the Instructor Development Course ("IDC"), and the Security Guard classes that were held on five occasions in 2016. (56.1 Stmt. ¶ 151). Brooke met with the County Attorney again on July 22, 2016 and outlined his concerns that Heubeck was not following DCJS regulations. (*Id.* ¶¶ 181, 182). On October 10, 2016, Brooke made an official complaint to DCJS of his concerns about the DTI course, the IDC, and the Security Guard classes, providing DCJS with "material Brooke took

from the Academy before he left, including material pertaining to security guard classes, defensive tactics course and instructor development." (*Id*. ¶¶ 229-230).

Thereafter, the County issued a "Request for Proposal" for BSC at the Academy for the 2017 calendar year ("2017 RFP"), to which Brooke, on behalf of FMB, submitted a proposal. (*Id*. ¶¶ 238, 248). FMB was not awarded the contract for 2017. (*Id*. ¶ 248). Accordingly, Plaintiffs contend that Defendants retaliated against them "for exercising [Brooke's] freedom of speech . . . by being an informant and/or reporting illegal or unlawful practices by Defendant Director Heubeck . . ." in violation of 42 U.S.C. § 1983. (Am. Compl. ¶ 83). Plaintiffs further contend that Heubeck made allegations concerning, *inter alia*, improper training methods and throwing a clipboard at Heubeck, thus defaming Plaintiffs. (*Id*. ¶¶ 101-111).

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-3875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not

to determine the truth or weigh the evidence. The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to

raise an issue of material fact with respect to an essential element of her[] claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

## ANALYSIS

In light of Judge Seibel's decision on the motions to dismiss as discussed *supra*, Plaintiffs' remaining claims for relief are the First Amendment retaliation claim alleged against all Defendants, and the state law claim of defamation alleged against Heubeck. The Court first considers Defendants' motions for summary judgment as regards Plaintiffs' First Amendment retaliation claim against Defendants.

I.   First Amendment Retaliation

A plaintiff asserting a First Amendment retaliation claim must establish that: "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 272 (2d Cir. 2011); *Santucci v. Levine*, No. 17-CV-10204, 2021 WL 76337, at *6 (S.D.N.Y. Jan. 8, 2021).  With respect to the first element, a court conducts a two-step inquiry to determine whether a public employee's speech is protected: "The first requires determining whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)). The step-one inquiry encompasses two separate sub-questions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti*, 547 U.S. at 420-22). If the answer to either question is no, that is the end of the matter.

While Defendants argue, *inter alia*, that Plaintiffs' speech was not protected because Plaintiffs spoke solely as an employee, and not as a citizen, thus precluding a First Amendment retaliation claim (*see, e.g.,* PCA Br. at 8-19), Plaintiffs contend that Judge Seibel already decided that Plaintiffs were speaking as citizens when she decided the motions to dismiss. (Pl. Br. at 8-9). A review of Judge Seibel's decision, however, reveals that at the motion to dismiss stage, "it [was] as a close question" and she found that Plaintiffs "plausibly allege[d] that Brooke spoke as a citizen, not an employee, when he made complaints to DCJS and the county attorney," thus permitting the claims to proceed to discovery. (Tr. at 44:13-15, 45:4-10). At this stage, now with the benefit of discovery, the question of whether Plaintiffs spoke as citizens or employees is properly raised on the instant motions for summary judgment. Based upon the undisputed record, the Court agrees with Defendants that Plaintiffs spoke as an employee and thus their complaints are not protected by the First Amendment.

"[W]hile the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. The inquiry into whether a public employee spoke pursuant to his official duties is objective and is "a practical one." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 202 (2d Cir. 2010) (citing *Garcetti*, 547 U.S. at 424)). The Court notes that the legal framework governing First Amendment retaliation claims by independent contractors of the government and employees of the government is the same. *See Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 684-85 (1996).

The Court must "ask two questions to determine whether a public employee speaks as a citizen: (A) did the speech fall outside of the employee's 'official responsibilities'[?] and (B) does a civilian analogue exist?" *Matthews v. City of New York*, 779 F.3d 167, 173 (2d Cir. 2015) (citing *Weintraub*, 593 F.3d at 203-04). Directing the speech at issue up the "chain of command" is evidence that the employee is speaking pursuant to his official duties. *Castro v. Cty. of Nassau*, 739 F. Supp. 2d 153, 180 (E.D.N.Y. 2010) (holding that a security guard was speaking as a public employee when he "directed his complaints up the operational chain of command"); *see also Carter v. Inc. Vill. of Ocean Beach*, 415 F. App'x 290, 293 (2d Cir. Mar. 18, 2011) (finding that plaintiffs were speaking pursuant to their official duties where their "allegations establish no more than that they reported what they believed to be misconduct by a supervisor up the chain of command—misconduct they knew of only by virtue of their jobs as police officers and which they reported as 'part-and-parcel of [their] concerns about [their] ability to properly execute [their] duties.'" (citing *Weintraub*, 593 F.3d at 203)).

The speech at issue here was not made within the express chain of command set forth in the FMB Contract. Although Defendants argue that Plaintiffs were required to report to DCJS, which is undisputed, the reporting that was required was submitting curricula for approval, and corresponding on issues such as approval of course instructors and scheduling changes. (56.1 Stmt. ¶ 36). With that said, Plaintiffs corresponded with DCJS regularly as BSC; and were familiar with DCJS due to Brooke's twenty-five-year relationship with the Academy. (*Id*. ¶¶ 10-16, 36-40). Importantly, the DCJS oversees Academy training (*id*. ¶ 8), and is tasked with supervising all basic schools in the state (*id*. ¶ 9; Tr. at 43:5-9).

A similar reporting scenario was at issue in *Kilduff v. Rochester City Sch. Dist.*, in which a homeless program coordinator employed by the Rochester City School District was found to be

acting within the scope of her employment when she complained about her employer's homeless program to two "independent" agencies that exercised supervision over the plaintiff's program. 53 F. Supp. 3d 610 (W.D.N.Y. 2014). In that case, the court distinguished complaints made to external unrelated agencies such as the FBI, EEOC, or a state senator or Office of Inspector General, from agencies tasked with monitoring the general management and supervision of the entity over whom the plaintiff performs services, and found that "a reasonable employee in Plaintiff's position would have been expected to approach [the latter] for assistance in addressing issues within the homeless education program." *Id*. at 616. Here, Plaintiffs' complaints to DCJS, like Kilduff's complaints, were made to an entity charged with monitoring and general management of aspects of the entity for whom Plaintiffs performed their duties. Thus, arguably, DCJS was within the chain of command.

With respect to the County Attorney, Defendants maintain that Plaintiffs' complaints were taken up the chain of command because Plaintiffs made the complaints in the first instance to the County Executive, who in turn directed them to contact the County Attorney. (56.1 Stmt. ¶¶ 137-138). As with DCJS, the FMB Contract does not provide that Plaintiffs were to report their complaints to the County Executive. (Chafizadeh Decl. Ex. P). The FMB Contract was signed on behalf of the County by the County Executive, and the County Executive advised Plaintiff that his office alone could terminate the FMB Contract. (56.1 Stmt. ¶¶ 31, 136, 139). While the chain of command set forth in the FMB Contract led to Huebeck as Academy Director, despite the language of the FMB Contract, Plaintiffs did not believe they were required to report to the Academy Director and believed they were required only to report to the County Executive. (*Id*. ¶ 35).

Although the Court is not convinced that Plaintiffs directed their complaints up the express chain of command for purposes of this First Amendment analysis, it is compelling that Plaintiffs'

complaints were made to those whom they believed were within the chain of command and those tasked with monitoring and management of the entity for whom Plaintiffs performed their official job duties. In any event, Defendants have proffered admissible evidence demonstrating that the speech at issue was at least "part-and-parcel" of Plaintiffs' concerns about their ability to properly execute their duties as BSC.

"[U]nder the First Amendment, speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description or in response to a request by the employer." *Weintraub*, 593 F.3d at 203. "*Weintraub* and its progeny make clear that merely reporting information outside the chain of command is not necessarily sufficient, in and of itself, to establish that a public employee was speaking as a citizen." *Williams v. Cty. of Nassau*, 779 F. Supp. 2d 276, 283-84 (E.D.N.Y. 2011), *aff'd*, 581 F. App'x 56 (2d Cir. 2014); *see also Malgieri v. Ehrenberg*, No. 12-CV-2517, 2012 WL 6647515, at *1 (S.D.N.Y. 2012) (speech that is outside the chain of command is not necessarily dispositive of whether a person is speaking as a citizen). Hence, even where the speech is made outside the "chain of command," a public employee speaks pursuant to his official duties if his speech was "part-and-parcel of his concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203; *accord Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009) ("[W]e have consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command.").

Where speech "owes its existence" to the employee's job duties, or is of the sort that is derived from special knowledge resulting from the speaker's employment, it is more likely that the speech was made as an employee than as a citizen. *Taylor v. New York City Dep't of Educ.*, No. 11-CV-7833, 2012 WL 3890599, at *3, *5, *7 (S.D.N.Y. Sept. 6, 2012). Where a speaker,

despite going "outside the chain of command," reports to an entity to which he regularly reports as part of his job, courts have held that speech is made pursuant to the speaker's official duties. *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115-17 (2d Cir. 2011) (speech not protected where employee reported to the DA's Office but regularly interacted with the DA's Office as part of his job).

As regards the factors the Court considers with respect to the "part and parcel" analysis, there are a number of important issues raised by Defendants in both the Rule 56.1 Statement and on their motions for summary judgment which have not been disputed or countered by Plaintiffs. In particular, Plaintiffs have not disputed or countered the following: (i) Brooke gained the knowledge used in connection with his complaints to the County Attorney and DCJS through his role as the BSC and, previously, as a twenty-five-year instructor at the Academy (*see, e.g.*, 56.1 Stmt. ¶¶ 10-16; Chafizadeh Decl. Ex. B at 245; *id*. Ex. C at 447-48); (ii) the material Brooke used to make his complaint to DCJS, and to support his statements to the County Attorney, were accessed and taken from the Academy network, something a citizen could not obtain (*see, e.g.*, Chafizadeh Decl. Ex. C at 494, 500, 528); (iii) Brooke used his regular line of communication with DCJS to gather information for his complaints and to communicate those complaints about Heubeck to DCJS (*see, e.g.*, 56.1 Stmt. ¶¶ 36-40; Chafizadeh Decl. Ex. B at 150-151, 242-245, 255; *id*. Ex. C at 392-394, 543, 578-586; *id*. Ex. D at 457); and (iv) Brooke's communications were made to DCJS and the County Attorney as entities charged with monitoring and oversight and/or were referred to Plaintiffs by the official to whom he believed he was to report (56.1 Stmt. ¶¶ 8, 9, 35, 137-138). (*See* PCA Reply at 5-6). In addition to those facts, Plaintiffs believed that a goal of their job was to have a professionally-run Academy, thus acknowledging that their official job duties as BSC were part of the broader organization of the Academy. (56.1 Stmt. ¶ 99).

Plaintiffs did not dispute these facts in their Opposition to Rule 56.1 Statement nor did they respond to Defendants' arguments concerning this "part and parcel" analysis in their opposition to these motions, thus waiving argument in opposition to them. *See, e.g.*, *Ventillo v. Falco*, No. 19-CV-03664, 2020 WL 7496294, at *12 (S.D.N.Y. Dec. 18, 2020) (plaintiff's failure to respond to defendants' point "alone warrant[ed] dismissal of [the] claim for relief."); *McGriff v. Keyser*, No. 17-CV-7307, 2019 WL 6033421, at *12 (S.D.N.Y. Nov. 13, 2019) (noting that plaintiff had abandoned claim "by failing to address any arguments on this issue in his [o]pposition brief."); *Cole v. Blackwell Fuller Music Publ'g, LLC*, No. 16-CV-7014, 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) ("Numerous courts have held that a plaintiff's failure to address an issue in its opposition raised by its adversary amounts to a concession or waiver of the argument."); *30 Clinton Place Owners Inc. v. City of New Rochelle*, 2014 WL 890482 *1, n. 1 (S.D.N.Y. 2014) ("A plaintiff . . . concedes a defendant's arguments by his failure to respond to them.").

In addition to the facts stated above, the record is clear that Plaintiffs were concerned about their ability to properly execute their job as BSC in light of their concerns about Heubeck and that the deteriorating relationship between Brooke and Heubeck was negatively impacting the Academy as a whole. Indeed, Plaintiff, in May 2016, wrote an email requesting mediation of his disputes with Heubeck and stated, in relevant part: "Our collective goal is to have a professionally run police academy. . . . I am hopeful that an understanding can be reached that will permit Heubeck and myself to be able to successfully and respectfully work together for the betterment of the Academy and its staff." (56.1 Stmt. ¶ 99 (citing Chafizadeh Decl. Ex. Y)). Brooke testified that the May 2016 e-mail was prompted by a scheduling dispute that he had with Heubeck (Chafizadeh Decl. Ex. C at 382-383, 378-379). Brooke's complaints about Heubeck to the County Attorney concerning the DTI course, the IDC, and the Security Guard classes were made after

being referred by the County Executive in connection with Brooke's complaint about his termination (56.1 Stmt. ¶¶ 136-137); and he discussed his contract dispute with the County Attorney in connection with those complaints as well (*id.* ¶¶ 148, 150-151, 154).

This situation is unlike that of *Matthews v. City of New York*, where the plaintiff's speech addressed his opinion on precinct-wide policy and thus had broader implications such as disclosing fraud to the public. 779 F.3d 167, 174 (2d Cir. 2015). Rather, Plaintiffs' complaints were issues more specific to Plaintiffs' job, and Plaintiffs' ability to execute his job in light of his relationship with Heubeck. Analyzing the foregoing objectively and practically, *Weintraub*, 593 F.3d at 202, the Court finds that Plaintiffs' speech was within their "official responsibilities" for purposes of this analysis. Bolstering the Court's finding is the fact that there is not a civilian analogue available for the way in which Plaintiffs' reported their concerns to the County Attorney and DCJS.

With respect to DCJS, although DCJS receives phone calls from the public about police training, the record reflects that those calls concern FOIL requests and general inquiries concerning the requirements to become a police officer. (Chafizadeh Decl. Ex. E at 125-26). Private citizens do not call DCJS to make complaints regarding police courses or curricula. (*Id.* at 134-36). This fact is not surprising, as private citizens do not observe, review, supervise, or approve Academy curricula; rather, the people who call DCJS concerning issues such as those raised by Plaintiffs are Academy employees or former Academy employees. (*Id.*). With respect to the County Attorney, as discussed *supra*, Plaintiff was referred by the County Executive, and the County Executive directed the County Attorney to prepare a confidential memorandum of findings. (56.1 Stmt. ¶ 138). Moreover, the material that Plaintiffs used to make the complaints to DCJS and the County Attorney was accessed and taken from the Academy network, something a citizen could not obtain. (Chafizadeh Decl. Ex. C at 494, 500, 528). While citizens may write letters, seek general

information, and make suggestions or comments to DCJS, non-employees would not have the kind

of access to DCJS and the County Attorney that Plaintiffs had as BSC.

Based on the foregoing undisputed facts, the Court finds the way in which Plaintiffs

reported their concerns to DCJS and the County Attorney has no citizen analogue. *See Williams*,

779 at 285-86; *Weintraub*, 593 F.3d at 204; s*ee also D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340,

354 (S.D.N.Y. 2010) (noting that plaintiffs' statements were "made *in a manner* that would not be

available to a non-public employee citizen" (emphasis added)); *see also Medina v. Dep't of Educ.*

*of N.Y.*, No. 10-CV-1180, 2011 WL 280800, at *3 (S.D.N.Y. Jan. 14, 2011) (plaintiff guidance

counselor who complained to principal, union representative, and students' parents "was only in a

position to raise these concerns to these specific people as a direct result of his position as a

guidance counselor"); *Heffernan v. Straub*, 612 F. Supp. 2d 313, 326 (S.D.N.Y. 2009) (holding

plaintiff's speech was made pursuant to his official duties when "an ordinary citizen not employed

by the Fire Bureau would not . . . have the opportunity to convey [his opinion] through the channels

that he utilized.").

In sum, on the basis of the uncontroverted facts in the record, this Court concludes as a

matter of law that Plaintiffs were speaking pursuant to their official responsibilities absent a

civilian analogue for such speech, and, as such, Plaintiffs' complaints to DCJS and the County

Attorney are not protected by the First Amendment.[3]

## II.   Defamation Claim

In light of the foregoing, Plaintiffs' sole surviving claim is against Heubeck for defamation

under New York State law. Because there is no longer any federal claim remaining against

---

[3] Because the Court finds that summary judgment for Defendants is appropriate on Plaintiffs' First
Amendment claim for relief on the grounds stated, it need not and does not consider the other grounds
raised by Defendants in their motions.

Heubeck, there is no longer any independent basis for federal jurisdiction over him in this action. Having determined that Plaintiffs' First Amendment claim against Defendants should be dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claim alleged against Heubeck. *Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 680 (E.D.N.Y. 2017), *aff'd*, 726 F. App'x 37 (2d Cir. 2018). The traditional values of judicial economy, convenience, fairness, and comity weigh in favor of declining to exercise supplemental jurisdiction where all federal law claims are eliminated before trial. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). Accordingly, the Court dismisses Plaintiffs' defamation claim against Heubeck without prejudice to allow Plaintiffs to pursue the claim in state court should they choose to do so. *Whitehead v. City of New York*, 953 F. Supp. 2d 367, 377 (E.D.N.Y. 2012).

<h2 align="center"><u>CONCLUSION</u></h2>

For the foregoing reasons, the Court GRANTS Defendants' motions for summary judgment dismissing Plaintiffs' First Amendment retaliation claim against the Defendants. The Court declines to exercise jurisdiction over the remaining claim of defamation against Heubeck and dismisses same without prejudice.

The Clerk is instructed to terminate the pending motions (Docs. 198, 207, 209) and to close this case.

Dated: White Plains, New York
        March 3, 2021

SO ORDERED:

_____
Philip M. Halpern
United States District Judge